**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SHAWN KELLY** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14 C 1086 |
| | ) | |
| v. | ) | |
| | ) | |
| **CAROLYN COLVIN** | ) | Magistrate Judge Daniel G. Martin |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Shawn Kelly ("Plaintiff" or "Kelly") seeks judicial review of a final decision of Defendant Carolyn Colvin, the Acting Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for disability insurance benefits under the Social Security Act in an August 10, 2012 written decision of Administrative Law Judge ("ALJ") Joel Fina. Kelly appealed the ruling to this Court and filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision. The Commissioner has filed a cross motion. The Court discusses the relatively sparse record only to the extent necessary to elucidate its ruling. Plaintiff has amply discussed the relevant evidence in his motion.

In brief, Plaintiff slipped on ice in 2008 and suffered injuries to his back. An MRI showed mild disc bulges, bilateral facet hypertrophy, and mild spinal stenosis in Kelly's lumbar spine. Plaintiff complained that the pain radiated down his legs and into his feet. Plaintiff sought treatment from his family physician as well as several specialists. He received medial branch blocks from a pain specialist in 2009, as well as medical branch

radiofrequency lesioning. Several epidural steroid injections provided temporary pain relief. Further MRI tests showed disc degeneration and lumbosacral spondylosis in the lumbar spine, as well as steophytes and foraminal encroachments in the cervical spine. Kelly was also treated for depression and anxiety.

Following the familiar five-step analytic process, ALJ Fina found at Step 1 that Kelly had not engaged in substantial gainful activity after his alleged onset date of August 18, 2009. His severe impairments at Step 2 included degenerative disc disease of the lumbar and cervical spine, as well as a mood disorder. The ALJ found at Step 3 that these impairments did not meet or equal a listing either singly or in combination. Before moving to Step 4, the ALJ concluded that Kelly's testimony concerning the severity of his symptoms was not credible (though some statements were credited). The ALJ placed little weight on the residual functional capacity assessment ("RFC") issued by the state-agency expert Dr. Henry Rohs. He also appeared to give little weight to the testimony of medical expert Dr. Ashok Jilhewar. The ALJ assigned no weight to a report issued by treating physician Dr. Chorba. He also declined to give "much weight" to a report given by psychiatrist Dr. Wolfram. Having set aside all the medical expert statements in one form or another, the ALJ then assessed Kelly's RFC. He found that Plaintiff could perform sedentary work as long as various exertional and non-exertional limitations were included. Kelly could not perform his past relevant work at Step 4. Relying on the testimony of a vocational expert ("VE"), the ALJ determined at Step 5 that jobs existed in the national economy that Kelly could perform. He therefore concluded that Plaintiff was not disabled.

## I. Legal Standard

### A. The Social Security Administration Standard

In order to qualify for DIB, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual

functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work.  The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant can do so, he is not disabled.  *Id.*  If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience.  An individual is not disabled if he can do work that is available under this standard.  20 C.F.R. § 404.1520(a)(4)(v).

### B.  Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court.  Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).  Thus, even if reasonable minds could

4

differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## II. Discussion

Plaintiff disputes the ALJ's findings on several grounds that Kelly does not make careful distinctions between in his motion. Liberally construed, he claims that the ALJ erred along three lines that are routinely claimed in such cases. Kelly contends that the ALJ (1) improperly weighed the medical experts' reports, (2) failed to articulate a proper RFC, and (3) presented improper questions to the VE at Step 5. The Court only addresses the first two issues. The ALJ will be able to address the third topic, if necessary, after re-considering the first two issues on remand.

### A. Dr. T.S. Chobra

Plaintiff's treating physician Dr. T.S. Chobra issued an expert report on Kelly's condition on July 26, 2011. Dr. Chobra had treated Kelly for over 10 years. (R. 381). He noted severe right knee and left leg pain, as well as numbness in the upper extremities and problems with allergies. Kelly's condition, which Dr. Chobra said included spinal stenosis and degenerative disc disease, had worsened. Dr. Chobra thought that Kelly would be unable to sit or walk for more than five to ten minutes at a time. He could not stand or walk for six hours during a normal eight-hour workday. Kelly's back pain would begin within 30 minutes of sitting. Dr. Chobra said that Kelly would need to elevate his feet while sitting by at least one to two feet. He could lift only five to ten pounds occasionally, and only five pounds frequently. Kelly would also need to lie down intermittently during a workday to

5

relieve his back pain. The ALJ gave no weight to the treating doctor's report because he thought it was inconsistent with the medical record. The ALJ's only specific point on the issue was that Dr. Chobra relied on neurological findings to account for Kelly's symptoms in the lower extremities. The ALJ thought that the record did not support "focal neurological losses." (R. 20).

The Court easily concludes that the ALJ's consideration of Dr. Chobra's report is erroneous. The regulations lay out six factors an ALJ should consider when evaluating an expert report, including the nature and length of the treatment relationship, the medical expert's specialization, and the degree to which a source's opinion is supported by other evidence. 20 C.F.R. § 404.1527(d)(1)-(6). The ALJ only considered what he thought was a contradiction between Dr. Chobra's reasoning and the medical record concerning Plaintiff's neurological condition. Even if that reasoning were valid, the ALJ failed to recognize that Dr. Chobra assessed more than just Plaintiff's exertional limits. He also found that Kelly could not work around dust, pollen, or mold because of his allergies. (R. 383). These restrictions, which the ALJ never recognized, have no relation to the absence of "focal neurological losses." The ALJ was required to explain why his reason for rejecting the report included this category of limitations. A treating physician's report can be given weight on some points and not on others. *McMurtry v. Astrue*, 749 F. Supp.2d 875, 888 (E.D. Wis. 2010); *Thompkins v. Astrue*, 2010 WL 5071193, at *7 (N.D. Ill. Dec. 6, 2010). Relying on the absence of neurological problems fails to address anything meaningful about Kelly's allergies.

The ALJ's stated reason for rejecting Dr. Chobra raises a different set of problems. "A focal neurologic deficit consists of a set of symptoms or signs in which causation can

6

be localized to an anatomic cite in the central nervous system." http://www.ajnr.org/content/29/10/1998.full. One problem with the ALJ's statement is that he never explained what it was in Dr. Chobra's evaluation that linked Kelly's lower-body restrictions to focal deficits. The Court notes that Dr. Jilhewar noted at the hearing that he differed with Dr. Chobra based on the absence of abnormal neurological findings. (R. 39). The ALJ, however, did not rely on that testimony to discount Dr. Chobra's report. Indeed, the ALJ never cited any of Dr. Jilhewar's statements. Dr. Chobra himself never attributed Plaintiff's limited ability to stand or walk to such problems. The report only says that it relied on "MRI's, progress notes, etc." (R. 381). That implies that Dr. Chobra relied on (1) his long-standing personal treatment history of Kelly, and (2) objective test results.

The ALJ never discussed the first of these elements. As for the second, MRIs are not necessarily limited to neurological assessments. They also include views of a patient's soft tissues, organs, and boney structures. *See* http://www.webmd.com/a-to-z-guides/magnetic-resonance-imaging-mri. Orthopedic issues were, in fact, one of Dr. Chobra's primary concerns in the report. He noted Plaintiff's spinal stenosis and degenerative disc disease. Degenerative disc disease is an orthopedic disorder in which "the intervertebral discs of the spine begin to deteriorate (or degenerate) as part of the normal aging process." https://www.rush.edu/services/conditions/degenerative-disc-disease. The ALJ overlooked that the record supports these diagnoses. Spinal stenosis was noted as early as December 2009. (R. 403). It was found again in March 2009. (R. 285). Degenerative disc disease was diagnosed in an MRI that Dr. Chobra himself ordered in March 2010. (R. 316). The MRI also showed facet arthropathy. (R. 403). The ALJ did not consider that report, thereby failing to account for the record as a whole.

The only possible reference to a neurological issue that Dr. Chobra made in relation to Kelly's lower-body problems concerned low back pain and numbness that radiated down the left leg. (R. 381). This suggests radiculopathy. The ALJ failed to account for the fact that several medical entries show that Kelly was suffering from some form of radiculopathy. (R. 287, 403). Dr. Prempreet Bajaj's July 2009 report confirms Kelly's complaints of "low back [pain] with radiation down the bilateral LE [left extremity.]." Dr. Bajaj diagnosed lumbar radiculitis. (R. 287). "Lumbar radiculopathy is a painful condition that happens when a nerve in your lumbar spine (lower back) is pinched or irritated." https://www.drugs.com/cg/lumbar-radiculopathy.html. A September 2011 MRI also showed that Kelly suffered from a "mild bilateral neural foraminal encroachment that may affect exiting L3 nerve roots." (R. 387). A foraminal encroachment "can force pressure on the nerves, which causes pain at the site of the impinged nerve as well as symptoms that travel to the extremities." https://www.laserspineinstitute/back-problems/foraminal_stenosis/encroachment. The ALJ made no attempt to square Dr. Chobra's assessment with these findings. Even if no "focal loss" existed, he was required to explain the basis of his findings with greater care. The issue was of special importance in this case because the ALJ rejected Dr. Jilhewar's testimony as well as Dr. Roh's RFC, thereby leaving him without medical assessments of Kelly's exertional abilities.

Equally important, the ALJ failed to address a third set of exertional restrictions that Dr. Chobra assessed concerning Plaintiff's ability to use his upper body. Dr. Chobra stated that Kelly's capacity to grasp, handle, and manipulate objects was limited. Dr. Chobra also said that Kelly's capacity to reach was limited. The RFC placed no restriction on such upper-body functions. Unlike Dr. Chobra's remarks concerning Kelly's lower body, his

report specifically mentions neurological issues (neuropathy) that were related to the use of his upper body.

The ALJ never addressed this issue and did not explain why the medical record was at odds with Dr. Chobra's assessment. Neuropathies that affect the hands and arms stem from the cervical spine. http://www.spine-health.com/conditions/neck-pain/what/cervical-radiculopathy. A September 2011 MRI of Kelly's cervical spine showed degenerative changes throughout the cervical area, as well as hard discs and facet hypertrophy that contributed to neural foraminal stenosis at the C4-C5 and C5-C6 levels. The ALJ noted this report. But he failed to address in any way what relation it had to Dr. Chobra's reliance on "neuropathy" for Kelly's upper-body limitations. At a minimum, the ALJ was required to draw a logical bridge between the record and his conclusion that Dr. Chobra's report was not entitled to any weight on all of the restrictions it found. Plaintiff's motion is granted on this issue.

### B. Dr. Blaise Wolfram

Kelly sought psychiatric care from Dr. Blaise Wolfram in 2012. Dr. Wolfram then issued a short expert report stating that Kelly had been depressed for ten years. He diagnosed "marked" limitations in Plaintiff's ability to maintain concentration for extended periods of time. (R. 448-54). The ALJ said that he did "not afford much weight" to Dr. Wolfram's conclusions. His reasons are difficult to follow. The ALJ seems to have believed that (1) Kelly was motivated by his disability filing and had not sought regular psychiatric care; (2) Dr. Wolfram's conclusion on concentration was contradicted by Kelly's own written statements; (3) the report did not "clearly represent a baseline level of functioning," and; (4) no objective tests confirmed Dr. Wolfram's conclusion. The Court

does not address the second and third of these factors because the Commissioner does not defend the ALJ's assessment on these grounds. That waives the ALJ's reliance on these factors.

The ALJ's first line of reasoning is without merit. Kelly seems to have seen Dr. Wolfram on only three occasions. The ALJ failed to state why that was insufficient to credit the treating expert's conclusions. The fact that Kelly's treatment period was limited is insufficient to support the ALJ's finding, at least standing on its own. Disability decisions often include expert reports that are based on only a single consultation. In fact, the ALJ cited a consultative report issued by Dr. Roopa Karri based on such a limited examination of Kelly. ALJs also often rely on reports provided by state-agency physicians who have never seen the claimant.

It is true that one reason for giving great weight to a treating expert's opinion is that he or she has a longer-term understanding of a claimant's condition. *See Scheck v. Barnhart*, 357 F.3d 697, 702-03 (7th Cir. 2004) (stating that one basis for giving substantial weight to a treating physician is the longitudinal view that the expert's opinion gives to the issue). That does not mean, however, that a treater like Dr. Wolfram can be dismissed simply because he did not treat Kelly as long as the ALJ might have wished. SSR 96-2p instructs ALJs that, even if they decide not to give controlling weight to a treating source opinion, such reports "are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. [§] 404.1527 and [§] 416.927." Even if Dr. Wolfram's limited treatment time did not entitle him to controlling weight, the ALJ needed to say more as to why he should be given no weight at all. Dr. Wolfram was still more familiar with Kelly's mental functioning than either the ALJ or any other expert that the ALJ cited.

The ALJ never explained what relevance Kelly's remark that he was seeking disability benefits had to evaluating Dr. Wolfram. The reason why a patient seeks psychiatric care should not, at least in principle, lead the psychiatrist to issue something less than an objective report. The ALJ may have meant that Kelly was exaggerating his symptoms in order to get benefits. That, of course, is a credibility issue more than a reason for discounting Dr. Wolfram's analysis. The ALJ never discussed why he thought Plaintiff overstated his condition. He was not entitled to question Dr. Wolfram based on an unexplained credibility assessment.

The ALJ may have thought that Kelly was not credible because he waited so long to seek professional psychiatric help. If so, then the ALJ was required to address the issue at the hearing and give Kelly an opportunity to explain himself. SSR 96-7p states that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide[.]" ALJ Fina made no attempt to do so in this case. He could not cast doubt on the legitimacy of Kelly's treating relationship with Dr. Wolfram without complying with this long-established rule. This would have required the ALJ to account for the fact that Kelly did not suddenly claim mental problems at the last minute. Dr. Chobra prescribed medication for anxiety and depression as early as March 2010. (R. 337).

Both the ALJ and the Commissioner claim that other evidence shows that Kelly's mental condition was not really as severe as Dr. Wolfram thought. They point to the March 2011 report of Dr. Karri, who reported that Kelly's affect was normal with no signs of depression or anxiety. (R. 350). Kelly was referred to Dr. Karri for an internal medicine

11

consultation for lower back pain. The report suggests that the doctor applied some form of brief mental status exam. He then reached a limited set of conclusions on Kelly's mental health as well as routine medical issues such as Kelly's cardiovascular, muscular, and neurological condition.

The ALJ provided no discussion of why Dr. Karri's conclusions were grounds for doubting Dr. Wolfram. Dr. Wolfram was a psychiatrist. Dr. Karri was an internal medicine specialist. The regulations instruct an ALJ that greater weight is ordinarily given "to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5). It also directs ALJs to consider the length of the treating relationship at issue. Dr. Karri only saw Kelly once. Dr. Wolfram saw him three times. The ALJ never addressed these issues. Having just criticized Dr. Wolfram for only treating Plaintiff for two months, the ALJ was obligated to provide some explanation for the contradictory finding that Dr. Karri could be relied on after giving a brief status exam during a single internal medicine consultation.

The ALJ also failed to consider that Kelly saw Dr. Karri nearly one year before he sought treatment with Dr. Wolfram. The ALJ seems to have assumed that if Kelly was not depressed in 2011, then he was not as seriously limited as Dr. Wolfram thought he was in 2012. Like the ALJ's reliance on Kelly's comment that he was seeking disability, this reasoning touches on Plaintiff's credibility. An ALJ is always required to consider that "[s]ymptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms." SSR 96-7p. The Seventh Circuit has instructed ALJs again and again to account for this directive in relation

12

to mental illness. Such disorders are episodic by nature. *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006). They "are characterized by 'good days and bad days,' rapid fluctuations in mood, or recurrent cycles of waxing and waning symptoms." *Phillips v. Astrue*, 413 Fed.Appx. 878, 886 (7th Cir. 2010). *See also Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). The ALJ never explained why a mental assessment in 2011 by a non-expert trumped the 2012 findings by a treating psychiatrist.

The Commissioner defends the ALJ's reasoning by claiming that the notes from the center where Kelly sought treatment do not contain clinical findings that support Dr. Wolfram's findings. The Commissioner is fully aware – or at least should be – that such a ground of argument is strictly forbidden in this case. The ALJ never based his assessment of Dr. Wolfram's report on non-confirming treatment notes from Behavioral Health Care Associates. He only noted that Dr. Wolfram's mental RFC "has some functional capacity limitations and referred to other notes." (R. 21). The Commissioner cannot defend an ALJ's decision on grounds that the ALJ herself did not rely on. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)). The Seventh Circuit has made it exceptionally clear that the Commissioner's continued violation of this rule violates repeated warnings on the issue. *See*, *e.g.*, *Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014) ("This is professional misconduct and if it continues we'll have to impose sanctions."); *Hughes v. Astrue*, 705 F.3d 276, 279 (7th Cir. 2013) ("Characteristically, and sanctionably, the government's brief violates the *Chenery* doctrine."); *Nimmerrichter v. Colvin*, 4 F. Supp.3d 958, 972 (N.D. Ill. 2013) ("The Government's non-compliance [with *Chenery*] invites and encourages noncompliance with

other rules by counsel against whom the Commissioner litigates.").

Like the ALJ, the Commissioner also argues that objective tests did not support Dr. Wolfram's conclusions. This, too, is seriously troublesome as a ground for rejecting the treating physician. The regulations reject the position that objective tests are *per se* requirements for evaluating mental impairments. The listings state that mental conditions are evaluated by medical evidence that includes a claimant's "symptoms." 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 12.00B. Symptoms are defined as "your own description of your physical or medical impairment(s)." *Id.* An objective test is not automatically required to evaluate such descriptions because they are subjective by definition.

The Commissioner's defense of the ALJ's decision overlooks that many courts have rejected the position that "objective" tests are always necessary when considering mental impairments:

> The accepted clinical technique for diagnosing a mental impairment is to assess the existence and severity of symptoms and signs identified by the American Psychiatric Association in the Diagnostic and Statistical Manual of Mental Disorders. . . . *This assessment is usually based on a patient's subjective reports and the [psychiatrist's] own observations*. The regulations specify that a psychiatric opinion may rest either on observed signs and symptoms or on psychological tests.

*Huskey v. Astrue*, 2007 WL 2042504, at *6 (D. Kan. July 5, 2007) (internal quotes and citation omitted) (emphasis added). *See also Schwarz v. Barnhart*, 70 Fed.Appx. 512, 518 (10th Cir. 2003) (rejecting a strict need for objective testing); *Garcia v. Comm. of Soc. Sec.*, 496 F. Supp.2d 235, 242 (E.D.N.Y. 2007); *Browning v. Astrue*, 2010 WL 3730172, at *13 (D.S.C. July 30, 2010). *See also Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015) (stating that rejecting a claimant's subjective allegations because they are not supported by medical findings constitutes a "fundamental error"). The ALJ should have explained

14

the basis of his reasoning with greater care if he thought that this case demanded something more than the accepted interview techniques that Dr. Wolfram used. Plaintiff's motion is granted on this issue.

### C. The RFC

ALJ Fina assessed Kelly's RFC as follows:

> [C]laimant has the residual functional capacity to perform sedentary work . . ., allowing that Claimant a sit/stand option alternatively at will provided that the individual is not off task more than 10 percent of the work period. Claimant can perform no climbing of ladders, ropes or scaffolds. He can occasionally climb ramps or stairs, balance, stoop, crouch, kneel, and crawl. He can frequently handle (gross manipulation of objects), and frequently finger (fine manipulations). He must avoid all exposure to unprotected heights. He is limited to simple, routine and repetitive tasks.

(R. 18). The Court first addresses the limited grounds that Kelly raises. It then discusses a more fundamental error on its own motion.

Kelly first claims that he is obese under the definition of SSR 02-1p, and that the ALJ failed to account for that condition. ALJ Fina was not aware that obesity was an issue in this case because Dr. Jilhewar testified that Kelly was not obese. Kelly now says that he actually has a body mass index of 33, which SSR 02-1p defines as obese.

The Court disagrees that this requires remand. Even if the ALJ erred by not addressing the obesity issue, it only amounts to harmless error. "[A] failure to explicitly consider the effects of obesity may be harmless error" when the ALJ adopts the RFC of a reviewing expert, and when the claimant fails to show how obesity further limits her functioning. *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006). A claimant can challenge the ALJ's finding only by submitting "evidence explaining how [her] obesity affected [her] ability to work or aggravated [her] other conditions." *Capman v. Colvin*, —

Fed.Appx. —, 2015 WL 3982131, at *5 (7th Cir. July 1, 2015). Kelly bears the burden of showing error on both of these issues. *See Thorps v. Astrue*, 873 F. Supp.2d 995, 1004 (N.D. Ill. 2012) ("The plaintiff bears the burden of proof through step four[.]").

Kelly fails to point to any evidence supporting a claim that obesity worsened his symptoms. The fact that he is both obese and suffers from musculoskeletal problems is insufficient, at least standing alone. No medical record states that obesity worsens Kelly's other problems. Plaintiff did not even allege at the hearing that his weight had an adverse effect on his functioning. Since this case already requires remand, however, the ALJ should determine if Kelly is obese and evaluate his condition under the requirements of SSR 02-1p.

Kelly also points to the fact that Dr. Chobra's expert report stated that he would need to lie down intermittently throughout an ordinary workday on his stomach. The Court agrees that the ALJ erred by not explaining why this was not part of the RFC. Since the ALJ's assessment of Dr. Chobra is erroneous, he necessarily failed to state why these limitations – which the ALJ never even recognized – lacked merit.[1] The same is true of Kelly's alleged incontinence. Dr. Jilhewar told the ALJ that there was no evidence in the record that Kelly experienced periodic difficulties in controlling his bowel functions. That was incorrect. Several medical records show that he made such complaints to various medical providers. The ALJ never explained why these statements were not credible, or why they were not considered in assessing Kelly's ability to carry out his work duties. An ALJ errs when he fails to consider evidence of incontinence. *Parker v. Astrue*, 597 F.3d 920, 923 (7th Cir.

---

[1] The same reasoning applies to the environmental restrictions that Dr. Chobra included in his expert report. As discussed above, the ALJ never recognized that the treating physician included such limitations on Kelly's ability to work.

16

2010); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

In addition to Kelly's limited grounds of complaint, the Court finds on its own motion that the RFC is erroneous on a more fundamental basis. SSR 96-8p strictly instructs ALJs that they "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g. daily activities, observations)." *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (stating that the failure to comply with the narrative discussion requirement of SSR 96-8p "is sufficient to warrant reversal of the ALJ's decision").

The RFC in this case does not meet this standard. The problem is that, having set aside all of the expert medical assessments of Plaintiff's work capacity, the ALJ never said what it was that remained in the medical record to support his own RFC assessment. As far as the Court can tell, the RFC is independent of any assessment or record. That was erroneous without at least some discussion of the issue. An ALJ is prohibited from constructing his own RFC after he has rejected the RFC assessments in the record. *Bailey v. Barnhart*, 473 F. Supp.2d 822, 838-39 (N.D. Ill. 2006). The Court recognizes that the RFC is a legal, not a medical, issue reserved to the Commissioner. *Newell v. Astrue*, 869 F. Supp.2d 875, 890-91 (N.D. Ill. 2012). But an ALJ must always explain in some minimal form how the record relates to his conclusions about what a claimant can do during an ordinary workday. This includes the entire record, including all medical and non-medical evidence. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). "The ALJs are not permitted to construct a 'middle ground' RFC without a proper medical basis." *Norris v. Astrue*, 776 F. Supp.2d 616, 637 (N.D. Ill. 2011).

A claimant's statements form part of the evidence the ALJ should consider. SSR 96-

8p. ALJ Fina did so in this case, though it compounds the problems involved in the RFC. The ALJ used much-criticized boilerplate language to claim that Kelly's allegations were "not credible to the extent they are inconsistent with the objective medical evidence and other evidence as defined in" the regulations. (R. 19). He then claimed that Kelly *was* credible on major statements concerning his ability to lift heavy objects, walk and stand, and work in difficult or complex settings. The ALJ stated that he adjusted the RFC to account for these limitations. This means that the RFC was based on certain aspects of Kelly's own testimony instead of the medical record itself.

That raises the critical question of why the ALJ decided to credit Kelly on some but not all of his statements. He *said* it was "because of significant inconsistencies in the record as a whole." (R. 19). But the ALJ never went on to explain what these alleged inconsistencies were, what aspects of Kelly's testimony they addressed or undermined, or why they were so serious that the full extent of Kelly's statements was not credible. If some of his statements were credible – and, remarkably, the ALJ thought that many of them were more credible than the medical experts (a great rarity in this Court's experience) – then what defined the dividing line between what was and was not credible? The ALJ did not explain the issue. The result is a tangled set of unexplained conclusions. The Court is unable to understand, for example, how the ALJ determined that Kelly might need to be off task for 10 percent of the time instead of, say, 5 or 15 percent. Why could he frequently handle objects instead of only occasionally being able to do so? Why could Kelly climb stairs at all? The ALJ never said. Without explaining how these restrictions relate to the record, it is not possible to determine anything meaningful about the ALJ's reasoning. That requires remand.

The ALJ is instructed to comply with the requirements of SSR 96-8p by discussing how the evidence supports the limitations that he included in the RFC. In doing so, the ALJ shall also explain more carefully how he relied on inconsistencies in the record to undermine Kelly's credibility. He shall articulate how he reached the credibility assessment by relying on all the factors set out in SSR 96-7p. *See* SSR 96-7p ("The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.").

### III. Discussion

Plaintiff Shawn Kelly's Motion for Summary Judgment [13] is granted. The Commissioner's Motion for Summary Judgment [20] is denied. The Commissioner's decision is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

ENTER:

_____
DANIEL G. MARTIN
United States Magistrate Judge

Dated: August 10, 2015.